IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| NATIONAL INDEMNITY COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>TRANSATLANTIC REINSURANCE COMPANY, FAIR AMERICAN INSURANCE AND REINSURANCE COMPANY (FORMERLY KNOWN AS PUTNAM REINSURANCE COMPANY),<br><br>Defendants. | 8:14-CV-74<br><br>MEMORANDUM AND ORDER |

    This matter is before the Court on its own motion, and on plaintiff National Indemnity Company (NICO)'s motion for a preliminary injunction. Filing 10. NICO asks the Court to enjoin defendant Transatlantic Reinsurance Company (Transatlantic) and its subsidiary, Fair American Insurance and Reinsurance Company (FAIRCO), from taking steps to pursue or commence arbitration against NICO under various reinsurance contracts between Transatlantic and FAIRCO and various third-party insurers. A hearing was held on March 24, 2014, *see* filing 37, and the matter is now ready for disposition.

    The parties are embroiled in a single overarching dispute, but it can be separated into two discrete halves. Each half has given rise to its own set of claims. In the first half, Transatlantic seeks to compel NICO to participate in an ongoing arbitration taking place in Chicago, and NICO seeks declaratory and injunctive relief establishing that NICO need not participate. In the second, Transatlantic and FAIRCO seek to compel NICO to begin arbitration in New York, and NICO again requests declaratory and injunctive relief to the contrary. Only NICO's claims are before this Court. Transatlantic's and FAIRCO's motions to compel arbitration are pending in the United States District Courts for the Northern District of Illinois and the Southern District of New York. As the Court explains below, all of these matters can be more

effectively resolved by severing NICO's claims and transferring them to the federal cases pending in Illinois and New York.[1]

## BACKGROUND
### I. THE CONTINENTAL CLAIM

The first half of the parties' dispute involves a 1985 reinsurance agreement between Transatlantic and Continental Insurance Company (Continental), whereby Transatlantic agreed to reinsure Continental for certain policies issued by Continental. Filing 12-1 at ¶ 5 (the "Transatlantic-Continental Agreement"). That agreement contains a clause requiring arbitration of any disputes arising under the agreement, with the arbitration to take place in the city of Continental's headquarters (Chicago). Filing 12-1 at ¶ 5; filing 12-2 at 17. In March 2013, Continental initiated arbitration against Transatlantic, seeking payments for various amounts Continental has allegedly paid under certain policies covered by the 1985 agreement. That arbitration is proceeding in Illinois. Filing 27-2 at ¶ 8. An arbitration panel has been selected and an organizational meeting was held on October 29, 2013. Filing 17-2 at ¶ 10.

NICO's involvement began in 2010, when NICO entered into various agreements with Continental. These included a "Loss Portfolio Transfer Reinsurance Agreement." Filing 12-1 at ¶ 14; filing 12-5. NICO alleges that this was (as suggested by its name) a reinsurance contract, under which NICO agreed to reinsure Continental with respect to certain legacy asbestos and environmental liabilities. Filing 12-1 at ¶ 14. NICO also entered into an administrative services agreement with Continental, whereby NICO agreed to provide administrative, claims handling, and reinsurance collection services. Filing 12-1 at ¶¶ 4, 14; filing 12-6. This included seeking reinsurance payments from Transatlantic under the Transatlantic-Continental Agreement. Filing 27-2 at ¶ 6.[2]

---

[1] NICO has styled its request for injunctive relief against both Transatlantic and FAIRCO as a single claim for relief. But as the Court explains below, the substance of the claim is severable. As a matter of style and convenience, the Court will generally refer to NICO's claims (in the plural) for injunctive relief. NICO's other causes of action, for declaratory relief, are already pleaded separately.

[2] At the March 24, 2014 hearing, NICO objected to several portions of the declaration of Beth Levene, a Transatlantic executive. *See*, filing 27-2; filing 37 at 6–9. The Court has considered Levene's declaration, in a very limited sense, for *relevant* background purposes, and as such, overrules NICO's relevancy and remaining objections.

Transatlantic asserts that, although styled as a reinsurance agreement,³ NICO has in fact assumed all of Continental's rights and obligations with respect to the underlying asbestos liabilities, including the right to pursue reinsurance from Transatlantic under the Transatlantic-Continental Agreement. Filing 17-2 at ¶¶ 9–14. More precisely, Transatlantic argues that the request for reinsurance payments that NICO has been sending to Transatlantic are for the benefit of NICO, not Continental. And, the argument continues, because NICO is seeking to directly benefit from the Transatlantic-Continental Agreement, NICO should be estopped from denying the agreement's corresponding obligations, including its arbitration clause.⁴ So, Transatlantic wants NICO brought into the ongoing arbitration.

NICO counters by arguing that it is simply acting as Continental's agent and not benefitting directly from the 1985 agreement, that NICO is not a signatory to that agreement and not bound by its arbitration provision, and that Transatlantic and Continental can resolve any issues in their pending arbitration without NICO's direct involvement.

In a letter to NICO dated February 27, 2014, Transatlantic demanded that NICO join the arbitration between Transatlantic and Continental. The letter stated that unless NICO consented to arbitration, Transatlantic would take immediate action to compel its participation. Filing 12-3. NICO refused, and on March 4, 2014, Transatlantic kept its word by filing a petition to compel arbitration with the United States District Court for the Northern District of Illinois. *See* filings 17-1 and 17-2; *see also Transatlantic v. NICO*, case no. 1:14-cv-1535, filings 1 and 8 (N.D. Ill. 2014) (the "Illinois action").

That petition asks the Illinois federal court to compel NICO to participate in the ongoing arbitration between Transatlantic and Continental, under § 4 of the Federal Arbitration Act, 9 U.S.C. § 4. Thus, the Illinois action presents a mirror-image of the first half of NICO's complaint in this case. The Illinois action was also filed before the present suit—1 hour before, to be precise. *See* filing 17-1.⁵ Faced with the prospect of duplicative litigation, this Court must determine whether it or the Illinois court should retain jurisdiction over the case. But, as noted above, there is a second half to this dispute, and it is not mirrored in the Illinois action.

---

³ *Cf.* 1A Steven Plitt, et al., *Couch on Insurance* § 9:4 (West 2013) (distinguishing reinsurance agreements from other arrangements between insurers).

⁴ In other words, Transatlantic is relying upon a "direct benefits" theory of estoppel. *See Reid v. Doe Run Res. Corp.*, 701 F.3d 840, 846 (8th Cir. 2012).

⁵ The Illinois action was filed at 3:59 p.m. on March 4, 2014. Filing 17-1. The Nebraska suit was filed at 4:59 p.m. on the same day.

## II. THE EAGLESTONE CLAIM

The second half of this dispute implicates a separate set of 41 reinsurance agreements between Transatlantic and FAIRCO as reinsurers, and numerous insurance companies affiliated with American International Group (the AIG affiliates) as primary insurers (the "AIG-TRC" agreements). Filing 4 at ¶ 46. Like the Transatlantic-Continental Agreement, the AIG-TRC agreements included asbestos-related liabilities. Filing 27-2 at ¶ 11. The AIG-TRC agreements also contained arbitration provisions. Transatlantic and FAIRCO have provided excerpts from many, but not all, of these agreements. Filing 4 at ¶ 47; filing 12-7; filing 12-8; filing 27-2 at 4, 48–171; filing 27-3; filing 27-4 at 1–171.

NICO's involvement began in 2011, when it signed what it characterizes as another reinsurance agreement, this time with Eaglestone Reinsurance Company (Eaglestone). Filing 12-1 at ¶ 23. NICO agreed to reinsure Eaglestone with respect to certain legacy asbestos and environmental liabilities which Eaglestone, in turn, had agreed to reinsure for the AIG affiliates. Filing 4 at ¶ 58; filing 12-1 at ¶ 23. NICO also entered into an administrative services agreement with the AIG affiliates, whereby it agreed to provide certain administrative, claims handling, and reinsurance collection services, including collecting reinsurance from Transatlantic. Filing 4 at ¶¶ 59–61; filing 12-1 at ¶ 23.

Here too, the parties dispute the extent to which NICO has assumed the rights and obligations of the AIG affiliates under the original AIG-TRC agreements. Transatlantic and FAIRCO again claim that NICO seeks to benefit directly from the AIG-TRC agreements and should be estopped from avoiding the corresponding arbitration provisions. And NICO again argues that it has merely been acting on behalf of the AIG affiliates and should not be bound to arbitrate under agreements it never signed or adopted.

On March 3, 2014, Transatlantic and FAIRCO sent NICO two letters, demanding that NICO participate in arbitration with them and the AIG affiliates with respect to the AIG-TRC agreements. Filing 12-1 at ¶¶ 15–17; filing 12-7; filing 12-8. Unlike the dispute between Continental and Transatlantic, there was no pre-existing arbitration involving the AIG affiliates. However, under the terms of the AIG-TRC agreements, these demand letters served to initiate the arbitration process. *See, e.g.*, filing 27-2 at 56. The letters also demanded that NICO appoint an arbitrator within 30 days (by April 2, 2014). Filing 12-7; filing 12-8.

The AIG-TRC agreements do not all contain identical arbitration provisions. However, they generally provide that each party is entitled to select one of the arbitrators that will hear the dispute. The agreements also generally provide that if either party fails to appoint an arbitrator within 30

- 4 -

days of a written demand, one will be appointed on that party's behalf by either a neutral third party or by the opposing party. *See, e.g.*, filing 27-3 at 41, 67.

The arbitration provisions of the AIG-TRC agreements differ from one another in one pertinent respect: they contain a variety of forum-selection clauses. The majority of the arbitration provisions designate New York City.[6] But a number of the contracts provide for arbitration in Boston,[7] and a handful of others specify various locations in California, New Hampshire, and Bermuda.[8]

### III. RECENT PROCEDURAL DEVELOPMENTS

In its order dated March 14, 2014, this Court noted the existence of the Illinois action and asked the parties to submit briefing on whether NICO's actions should more appropriately be resolved in Nebraska or Illinois. Filing 20. The Court set the matter for a hearing on March 24. *See* filing 37. In the interim, on March 19, Transatlantic and FAIRCO filed suit in New York state court, seeking an order compelling NICO to arbitrate under the AIG-TRC agreements. Filing 27-1 at 5–20. On March 24, this Court conducted a hearing on these matters. Then, on March 25, NICO removed the New York state court action to the United States District Court for the Southern District of New York. *Transatlantic Reinsurance Co. v. National Indem. Co.*, case no. 1:14-cv-2109 (S.D.N.Y. 2014).

To summarize: the Continental claims are pending in parallel form in Nebraska and Illinois, and the Eaglestone claims are pending in parallel form in Nebraska and New York. So, the Court returns to the threshold question identified in its previous order: where should NICO's claims be resolved?

### ANALYSIS

Generally, federal courts have a virtually unflagging obligation to exercise the jurisdiction given them. *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976). However, where federal courts are simultaneously exercising jurisdiction over what is essentially the same matter, one court may defer to another based upon considerations of wise

---

[6] *See, e.g.*, filing 27-2 at 81, 93, 96, 98, 101, 128, 135, 139, 144; filing 27-3 at 4, 9, 12, 15, 18, 21, 26, 29, 33, 41, 46, 49, 52, 56, 61, 64, 67, 73, 77, 81, 83, 85, 88, 91, 94, 97, 100, 103, 106, 109, 112, 114; filing 27-4 at 28, 102, 105, 108, 153, 158, 161, 164.

[7] *See, e.g.*, filing 27-2 at 118, 121, 125; filing 27-4 at 113, 117, 121, 126, 130, 134, 137, 142, 144, 146, 148, 168.

[8] *See, e.g.*, filing 27-2 at 56, 58, 71, 78, 112, 114; filing 27-3 at 37, 70; filing 27-4 at 171.

judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation. *Id*. In this context, there is no rigid or inflexible rule for determining the priority of cases, and the matter is committed to the Court's discretion. *Florida v. United States*, 285 F.2d 596, 604 (8th Cir. 1960).

The threshold issue in determining whether to abstain due to the pendency of concurrent federal proceedings is whether the proceedings are, in fact, "duplicative" or "parallel." *Ritchie Capital Mgmt., L.L.C. v. Jeffries*, 849 F. Supp. 2d 881, 888 (D. Minn. 2012); *CRST Van Expedited, Inc. v. J.B. Hunt Transp., Inc.*, 2005 WL 741911, at *5 (N.D. Iowa 2005). Cases are entirely parallel where the same parties are litigating the same issues at the same time in more than one federal court. *Blakley v. Schlumberger Tech. Corp.*, 648 F.3d 921, 932 (8th Cir. 2011). Complete identity, however, is not required. Rather, "the crucial inquiry is one of 'substantial overlap'" between the parties and issues being litigated. *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950–51 (5th Cir. 1997); *see also*, *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 232–33 (4th Cir. 2000); *Gries v. Standard Ready Mix Concrete, L.L.C.*, 2007 WL 1970979, at *3 (N.D. Iowa July 3, 2007).

When NICO's claims relating to the Continental and Eaglestone matters are considered separately, they are essentially the mirror images of the cases pending in Illinois and New York. It is true that, at this time, NICO's request for injunctive relief is not pending in either of those cases. But resolution of the motions to compel arbitration in those cases will necessarily dispose of NICO's claims. NICO will either be found to have consented to an enforceable arbitration clause, or not. Either way, the issues underlying NICO's request for injunctive and declaratory relief will be resolved.[9]

It is less clear whether there is substantial overlap between the Continental and Eaglestone claims. On the one hand, the claims involve similar issues of fact, and both boil down to whether NICO should be bound under a direct-benefits theory of estoppel. On the other hand, the claims are premised on separate underlying contracts which involve different parties and were signed at different times. Determining whether NICO is bound by

---

[9] NICO does present an additional claim for declaratory relief on the Eaglestone side. NICO's fourth claim for relief requests a declaration that the Eaglestone arbitration demands are defective under the terms of the AIG-TRC agreements. Filing 4 at ¶¶ 72–76. But the presence of this additional claim for relief does not significantly diminish the otherwise substantial (and nearly total) overlap between the Eaglestone claims and the New York action. *See, e.g.*, *Fuller v. Abercrombie & Fitch Stores, Inc.*, 370 F. Supp. 2d 686, 690 (E.D. Tenn. 2005); *Remington Arms Co., Inc. v. Alliant Techsystems, Inc.*, 2004 WL 444574, at *2 (M.D.N.C. Feb. 25, 2004).

the arbitration clause of the Transatlantic-Continental Agreement will require consideration of that agreement, NICO's agreements with Continental, and the legal consequences of those subsequent agreements and the actions NICO has taken under those agreements. Deciding whether NICO is bound by the arbitration clauses of the AIG-TRC contracts will require consideration of those agreements and NICO's more recent arrangements with Eaglestone and the AIG affiliates. For now, it is enough to note that when considered separately, the Continental and Eaglestone claims before this Court are in substantial overlap with the actions pending in Illinois and New York.

Given this overlap, the Court must determine how to best resolve the parties' disputes while avoiding duplicative litigation. The starting point for any such analysis is the "first-filed" rule: generally, in cases of concurrent jurisdiction, the first court in which jurisdiction attaches has priority to consider the case. *Nw. Airlines v. Am. Airlines,* 989 F.2d 1002, 1005 (8th Cir. 1993). However, as is the broader rule in this context, the first-filed rule should not be applied in a rigid, mechanical, or inflexible manner. *Id.* Instead, it should be applied in a manner best serving the interests of justice. *Id.* The prevailing standard is that, in the absence of compelling circumstances, the first-filed rule should apply. *Id.*

When faced with parallel litigation, the Court may determine that the case before it should be dismissed, stayed, or transferred and consolidated. *Collegiate Licensing Co. v. Am. Cas. Co. of Reading, Pa.,* 713 F.3d 71, 78 (11th Cir. 2013). In this context, transfers are subject to the same considerations underlying the general change of venue statute, 28 U.S.C. § 1404. Specifically, an action may only be transferred to any other district "where it might have been brought," i.e., where venue would have been proper and the transferee court could exercise personal jurisdiction over the defendant. 28 U.S.C. § 1404(a); *Hoffman v. Blaski,* 363 U.S. 335, 343 (1960).[10] Additionally, § 1404(a) only authorizes the transfer of an entire action, not individual claims. *Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509, 1518 (10th Cir. 1991). However, in certain "rare circumstances," it may be appropriate for a court to sever claims under Fed. R. Civ. P. 21 in order to effectuate their separate transfer. *Chrysler Credit Corp.,* 928 F.2d at 1518.

---

[10] NICO has not suggested that venue is otherwise improper or that personal jurisdiction over it is lacking in Illinois or New York. Given the underlying facts of the case, and NICO's involvement and arrangements with Illinois and New York companies, the Court has no doubt that NICO is subject to personal jurisdiction in both states. *See, e.g.*, filing 12-5 at 29 (NICO-Continental agreement providing for arbitration in either Illinois or New York); filing 27-2 (detailing activities of NICO employees in New York and Illinois); filing 27-4 at 197–232 (bills sent to Transatlantic).

As this case demonstrates, these seemingly straightforward principles are sometimes easier to articulate than to apply. But that is to be expected; there are no hard and fast rules in this area, and the determination is ultimately one of discretion, grounded in the Court's responsibility to administer its docket and promote the efficient and equitable resolution of cases before it. After careful consideration, and with the benefit of counsel's thorough briefing on the matter, the Court finds that these cases will be most effectively and comprehensively resolved by severing NICO's claims and transferring them to Illinois and New York. Explaining why will require a brief detour through § 4 of the Federal Arbitration Act, before returning to the general framework identified above.

### I. THE PROPER VENUE TO ENJOIN AND COMPEL ARBITRATION

This Court has the authority to grant NICO the relief it seeks—an order enjoining Transatlantic and FAIRCO from taking steps to compel NICO to arbitrate. But the reverse is not true. Or, more accurately, this is not a proper venue for consideration of Transatlantic's and FAIRCO's motions to compel arbitration. Under 9 U.S.C. § 4 of the Federal Arbitration Act, if an arbitration clause contains a choice of venue provision, only a court within the same district of that venue can enter an order compelling arbitration. *Kawasaki Heavy Indus., Ltd. v. Bombardier Rec. Prods., Inc.*, 660 F.3d 988, 997 (7th Cir. 2011). The arbitration clause in the Transatlantic-Continental agreement calls for arbitration in Chicago, and the clauses in the majority of the AIG-TRC agreements call for arbitration in New York City. Thus, only courts in Illinois and New York can properly compel arbitration under those contracts.[11]

These complications are a byproduct of § 4 itself. That section governs actions to compel arbitration, and sets forth the proper venue for such actions. It provides, in relevant part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being

---

[11] As noted above, several of the AIG-TRC agreements call for arbitration in locales other than New York City. This matter is addressed below.

> satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.

9 U.S.C. § 4.

By its terms, § 4 addresses only the proper venue for petitions to *compel* arbitration; it is silent as to motions to *enjoin* arbitration. Thus, actions to enjoin arbitration are properly considered under the general venue provisions. *Textile Unlimited, Inc. v. A..BMH & Co.,* 240 F.3d 781, 785 (9th Cir. 2001). This reading of § 4 is consistent with one of the fundamentals of arbitration jurisprudence: that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed to submit. *Id.* at 786 (citing *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582 (1960)). Moreover, "[r]equiring a party to contest the very existence of an arbitration agreement in a forum dictated by the disputed arbitration clause would run counter to that fundamental principle." *Id.* The Eighth Circuit has not addressed this issue, but the Court finds the reasoning of *Textiles Unlimited* persuasive. So, venue for NICO's claims is proper here, even though it would require the Court to enjoin arbitration that would occur in other districts.

The same cannot be said for motions to compel arbitration. Venue for such motions is explicitly addressed in § 4. Unfortunately, § 4 fails to give clear guidance on this issue, and courts have taken three different approaches when the underlying agreement states that arbitration shall proceed in another district. Again, the Eighth Circuit has not had an opportunity to address the matter. After considering each, the Court finds the third, majority approach to be the most feasible and the most consistent with the underlying purpose of § 4.

The first approach was set forth in *Dupuy-Busching Gen. Agency, Inc. v. Ambassador Ins. Co.,* 524 F.2d 1275 (5th Cir. 1975), where the court held that a district court may compel arbitration in the venue specified in the arbitration agreement, even where that venue is in another district. This holding is grounded in the unique facts of the case. In *Dupuy-Busching*, the parties' contract called for arbitration in New Jersey. The party wishing to avoid arbitration filed suit in Mississippi federal court, seeking an injunction. The other party responded by petitioning the Mississippi court to compel arbitration in New Jersey, which the court granted. *Id.* at 1276–77. The Fifth Circuit affirmed, reasoning that if the party seeking arbitration had not filed

its petition in Mississippi, it might have been barred from raising it in a subsequent suit. The Fifth Circuit held that compelling arbitration in another district was an acceptable means of avoiding this "procedural trap." *Id.* at 1277–78.

To its credit, the *Dupuy-Busching* approach protects the parties' expressed intent to arbitrate in a particular forum. But, as the Fifth Circuit recognized, it does so in a manner contrary to the express terms of the FAA, by requiring "courts to ignore the statutory directive that the arbitration proceed in the district where the petition was filed." *J.P. Morgan Sec. Inc. v. La. Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70, 82 (S.D.N.Y. 2010).

The second approach, adopted by the Ninth Circuit, permits a district court to compel arbitration in its own district, even where an arbitration clause specifies another venue. *Continental Grain Co. v. Dant & Russell*, 118 F.2d 967, 968–69 (9th Cir. 1941). In *Continental Grain*, the contract specified a New York venue. The party seeking arbitration petitioned a federal court in Oregon, and asked it to compel arbitration in New York. *Id.* at 968. The district court ordered arbitration, but in its own district. The Ninth Circuit affirmed, noting that § 4 requires that proceedings be held in the district where the petition for an order directing arbitration is filed. *Id.* at 969. Under this reading, § 4 only confines arbitration to the district in which the petition to compel is filed; it does not require the *petition* to be filed in any particular district. *Textiles Unlimited*, 240 F.3d at 785. And by invoking the jurisdiction of another court, the party seeking arbitration was not in a position to complain.

Although it follows one statutory directive, this approach "requires courts to ignore [another] clear statutory directive—this time that the arbitration proceed in 'accordance with the terms of the agreement.'" *J.P. Morgan Sec. Inc.*, 712 F. Supp. 2d at 82. Moreover, under this approach, "any party to an arbitration agreement could avoid the effect of the agreed-to forum merely by filing suit in a different district." *Snyder v. Smith,* 736 F.2d 409, 419–20 (7th Cir. 1984), *overruled on other grounds in Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998). And this "could lead to the parties racing to different courthouses to obtain what each thinks is the most convenient forum for it, in disregard of its contractual obligations." *Id.*

This Court favors the third, majority approach, which holds that where an arbitration provision contains a forum selection clause, the only proper venue in which to compel arbitration is the venue encompassing that forum. *See, e.g.*, *Haber v. Biomet, Inc.*, 578 F.3d 553, 558 (7th Cir. 2009); *Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214 (10th Cir. 2005); *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1018 (6th Cir. 2003); *J.P. Morgan Sec. Inc.*, 712 F. Supp. 2d at 82-83; *Am. Int'l. Specialty Lines Ins. Co. v. A.T.*

- 10 -

*Massey Coal Co., Inc.*, 628 F. Supp. 2d 674, 683 (E.D. Va. 2009); *cf. UAL Corp. v. Mesa Airlines, Inc.*, 88 F. Supp. 2d 910, 913–14 (N.D. Ill. 2000).

The third approach does the best job of adhering to the text of § 4, as it does not require courts to ignore either of the mandatory directives in the statute: that arbitration "shall . . . proceed . . . in accordance with the terms of the agreement" and that such proceedings "shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4; *J.P. Morgan Sec. Inc.*, 712 F. Supp. 2d at 83.[12]

Moreover, this case is distinguishable from the factual scenarios that prompted the rulings in *Dupuy-Busching* and *Continental Grain*. Here, the parties seeking to compel arbitration have brought suit in the proper venues, unlike the petitioner in *Continental Grain*. And unlike *Dupuy-Busching*, there is no need to ignore the express terms of § 4 to avoid a "procedural trap." First, there is no trap set for Transatlantic's claims relating to the Continental agreement, as Transatlantic was the first to file suit. And even if there were reason to believe that Transatlantic and FAIRCO could be required to assert their Eaglestone claims in this Court, any procedural trap can be sprung by dismissing or transferring this action.

NICO argues that § 4 simply governs venue, not jurisdiction, and that it is subject to waiver. And NICO is happy to waive venue as to any motion to compel arbitration, provided that venue is Nebraska. NICO is correct on the first point: § 4 is a venue provision. *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1052–55 (10th Cir. 2006). That makes sense, given that the FAA does not independently confer subject matter jurisdiction. *Id.* at 1054. But *1mage* does not stand for the proposition that waiver by the party being compelled will suffice. In that case, the Tenth Circuit upheld the district court's decision to compel arbitration in another district on waiver grounds, but only because *both* parties had failed to raise the issue before the district court. *Id.* at 1052. Transatlantic and FAIRCO have emphatically

---

[12] The *J.P. Morgan* court reasoned that this third approach has the (lesser) drawback of rendering the first sentence of § 4 meaningless. 712 F. Supp. 2d at 83. That sentence states that a party seeking to compel arbitration may proceed in any district court with jurisdiction. This Court does not view the third approach as rendering this sentence meaningless. The first sentence of § 4 does not prescribe a venue, rather, it provides a remedy. *Bao v. Gruntal & Co., Inc.*, 942 F. Supp. 978, 983 (D.N.J. 1996) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer,* 49 F.3d 323, 327 (7th Cir. 1995)). That is, a party may petition any otherwise proper district court for relief. But by its own terms, § 4 then "quickly narrows" the method of obtaining such relief by establishing the proper venue, and requiring a "geographic link between the site of the arbitration and the district which, by compelling arbitration or directing its scope, exercises preliminary control." *Lauer,* 49 F.3d at 327. The first sentence is not thereby rendered meaningless. Rather, it applies in cases where the arbitration clause does not specify a venue.

- 11 -

argued that venue is not proper here. The Court is not convinced that NICO's waiver alone will suffice.

In sum, the Court finds that while it has the authority to enjoin arbitration proceedings in other districts, this is not the proper venue to compel arbitration that would occur outside Nebraska. With that determination in hand, the Court returns to the question of where the present dispute should be resolved.

## II. COMPELLING CIRCUMSTANCES WARRANT A DEPARTURE FROM THE FIRST-FILED RULE

Leaving aside questions of practicality and feasibility, there are five possible outcomes here. They are: (1) NICO's claims could remain pending before this Court; (2) all of NICO's claims could be transferred to Illinois; (3) all of NICO's claims could be transferred to New York; (4) one of NICO's claims could be transferred and one could remain here; or (5) the New York and Illinois actions could proceed, and NICO's claims could either be dismissed without prejudice, stayed, or severed and transferred to the respective courts. NICO's preference is for outcome (1). Presumably, under that option, the motions to compel in Illinois and New York would be stayed. None of the parties want to see (2) or (3) happen, and so those options will be put aside. As the Court explains below, (4) is the least practical and efficient of the options, and will also be rejected. That leaves (5), which is the preferred outcome of Transatlantic and FAIRCO.

When choosing among these options, a strict application of the first-filed rule would not please anyone involved. Assuming the claims are not severed, the first-filed rule would result in all claims proceeding in Illinois. As noted above, no one is asking for this. If the claims were severed, the Continental claims would proceed in Illinois, and the Eaglestone claims would proceed here. But that is the least efficient outcome, and not particularly desired by either party. That approach would still require two courts to consider these disputes, but without the advantage of those two courts being in Illinois and New York, where the courts may afford complete relief among the parties. So, the real choice before the Court is whether to retain all of NICO's claims or to allow those claims to proceed in Illinois and New York (whether through a transfer or dismissal without prejudice). The Court finds that compelling circumstances support the latter option.

At the outset, the Court notes that the parties' actions have not raised any of the "red flags" that sometimes warrant departure from the first-filed rule. *Nw. Airlines,* 989 F.2d at 1007. Such red flags are raised when, for example, it appears the first-filing party acted in bad faith or raced to the courthouse to preempt a suit by the other party. *Id.* Other examples include

when the first suit was filed after the other party gave notice of its intention to sue or where the first action was for declaratory relief rather than damages or equitable relief. *Boatmen's First Nat. Bank of Kan. City v. Kan. Pub. Emps. Ret. Sys.*, 57 F.3d 638, 641 (8th Cir. 1995).

Nothing in the filing of these three cases suggests any impropriety or improper gamesmanship. It is true that NICO's suit is primarily a declaratory action, and that it was filed soon after NICO received Transatlantic's arbitration demand. But the nature of NICO's complaint does not suggest that it was "conceived or drafted in a heated rush to win a race to the courthouse." *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 922 F. Supp. 1334, 1343 (N.D. Iowa 1996) ("*Terra I*"), *aff'd* 119 F.3d 688 (8th Cir. 1997) ("*Terra II*"). And the Court credits NICO's assertion that it simply seeks to resolve all of the claims against it in a single forum which is convenient for NICO. Nor does the Court detect any skullduggery on the part of Transatlantic or FAIRCO. It made sense for them to file suit in Illinois and New York, as they seek to compel arbitration in those states.

More pertinent to the present case is another "exception" to the first-filed rule, although it is more properly thought of as part of the analysis to be considered with each application of the rule. When considering whether to defer to parallel litigation, courts look by analogy to the "balance of convenience" and "interest of justice" factors set forth in 28 U.S.C. § 1404(a). *Terra I*, 922 F. Supp. at 1348–50; *see also*, *CRST Van Expedited*, 2005 WL 741911, at *5–6.

The balance of convenience factors include, among others, (1) the convenience of the parties; (2) the convenience of the witnesses—including the willingness of witnesses to appear, the ability to subpoena witnesses, and the adequacy of deposition testimony; (3) the accessibility of records and documents; (4) the location where the conduct complained of occurred; and (5) the applicability of each forum state's substantive law. *Terra II*, 119 F.3d at 696.

These factors are largely neutral, but lean slightly in favor of Illinois and New York. The convenience of the parties is a wash. Neither side has provided evidence that litigating in any of these locations would be unduly inconvenient. Similarly, the availability of records and convenience of witnesses are not significant considerations in this case. It appears that all or nearly all of the pertinent records are already available in electronic format, and neither side has suggested that any potential witnesses would be unavailable or unduly inconvenienced.

The fourth factor, the location of the conduct underlying the suit, does not favor suit in Nebraska. There is little to tie this case to Nebraska other than it being NICO's headquarters and the fact that NICO received a handful

of letters demanding arbitration. Otherwise, the underlying dispute bears no substantial connection to Nebraska. This case concerns arbitrations that, if they occur, will be in Illinois and New York. The contracts containing arbitration clauses are between Transatlantic and FAIRCO (New York companies) and Continental (which appears to be based in Illinois) and the AIG affiliates (based in New York, Pennsylvania, and Illinois, among other states that are not Nebraska). *See*, filing 12-5 at 8; filing 13-1 at 2. NICO's contracts are with Continental, the AIG affiliates, and Eaglestone, which is based in Pennsylvania. Filing 12-9 at 6. Wherever the geographic focus of this dispute might be, it is not in Nebraska.

Finally, whether NICO may be bound by the arbitration clauses will likely be governed by state law, *see First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944 (1995), but it will almost certainly not involve the application of Nebraska law. None of the agreements before the Court are governed by Nebraska law. The Transatlantic-Continental Agreement does not appear to contain a choice of law clause. Only excerpts of the AIG-TRC agreements are in the record at this time, but there is no reason to expect any of them would call for application of Nebraska law. And to the extent the case turns on the interpretation of NICO's contracts with Continental, Eaglestone, and the AIG-affiliates, those are governed by New York and Pennsylvania law. Filing 12-5 at 39; filing 12-6 at 45; filing 12-9 at 32; filing 13-1 at 50.

The "interest of justice" factors are, with one exception, similarly insignificant. Those factors include (1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties of litigating in each forum, (4) each party's ability to enforce a judgment, (5) obstacles to a fair trial, (6) conflict of law issues, and (7) the advantages of having a local court determine questions of local law. *Terra II,* 119 F.3d at 696. Factors (2) through (7) are not particularly instructive. There are no obstacles to a fair trial here or elsewhere, nor any concerns about the enforceability of a judgment. As noted above, it is not clear which state's law applies, only that it is almost certainly not Nebraska's. Finally, the plaintiff's choice of forum is generally entitled to great weight, especially where, as here, it is the plaintiff's home forum. But this factor is somewhat less persuasive in this case, because Nebraska bears little connection to the underlying dispute. *See In re Link_A_Media Devices Corp.,* 662 F.3d 1221, 1223 (Fed. Cir. 2011).

Ultimately, § 1404(a) places "discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988). In this case, the Court sees two factors as determinative: judicial economy and the ability to comprehensively resolve the parties' dispute. Both will be best served by severing NICO's claims and

allowing them to proceed in forums that can afford complete relief among the parties.

This Court has the authority to enjoin arbitration pending in another district, and could thus potentially grant NICO the relief it seeks. But in the broader context of the dispute between NICO, Transatlantic, and FAIRCO, this Court may be unable grant complete relief. Only an Illinois court may compel NICO to arbitrate in Illinois, and only a New York court may compel NICO to arbitrate in New York. So, if it turns out that NICO should be required to arbitrate, further proceedings will be required in Illinois and New York. As such, this Court cannot comprehensively resolve the parties' dispute. Nor, acting alone, can the courts of either Illinois or New York. Instead, the most efficient and conclusive means of resolving whether NICO should arbitrate is for the parties' claims to proceed simultaneously before the courts that can afford complete relief.[13]

There remain a handful of procedural matters to address. First, as noted above, severing claims in order to effectuate a transfer is appropriate only in rare circumstances. *Chrysler Credit Corp.*, 928 F.2d at 1518. For all of the reasons discussed above, the Court finds such circumstances here. The Court further finds that transferring NICO's claims, rather than dismissing or staying them, is the best approach. The Court does not believe that staying the claims would serve any useful purpose. Dismissal without prejudice would not result in any particular harm to NICO, as it could refile its claims in any proper forum, or simply resist the pending motions to compel arbitration. But out of an abundance of caution, the Court's default preference is to sever and transfer NICO's claims. That said, the Court will give NICO the opportunity to choose between dismissal and transfer.

Second, severance under Rule 21 is proper. When considering whether to sever claims, courts consider: (1) whether the claims arise out of the same transaction or occurrence, (2) whether the claims present some common questions of law or fact, (3) whether settlement of the claims or judicial economy would be facilitated, (4) whether prejudice would be avoided if severance were granted, and (5) whether different witnesses and documentary proof are required for the separate claims. *Prospect Capital Corp. v. Bender*, 2009 WL 4907121, at *7 (S.D.N.Y. Dec. 21, 2009); *see also*

---

[13] As NICO points out, not all of the AIG-TRC agreements call for arbitration in New York. Transatlantic and FAIRCO counter (and NICO does not dispute) that despite the varying locales specified in the AIG-TRC agreements, arbitrations under those agreements have historically been consolidated in New York. Filing 27-1 at ¶ 17. If NICO is found to be subject to those arbitration provisions, the Court has no doubt that it can come to a similar arrangement with Transatlantic and FAIRCO.

*Arcure v. Cal. Dep't. of Developmental Servs.*, 2014 WL 346612, at *6 (E.D. Cal. Jan. 30, 2014).

Although there is some overlap between the Continental and Eaglestone claims, they arise from separate transactions involving separate companies and distinct contracts. They present similar, but not identical questions of fact and law. It is not clear whether the claims will be governed by the same state's law. And as the Court has explained, severance will promote judicial economy and the comprehensive resolution of this case. Thus, severance is appropriate.[14]

Specifically, NICO's request for injunctive relief will be severed as between the Continental and Eaglestone claims. To the extent NICO's request for injunctive relief relates to Transatlantic's demand that NICO participate in the ongoing arbitration in Chicago, it will be paired with NICO's first claim for declaratory relief and transferred to Illinois. The Eaglestone portion of the injunctive claim will be transferred, along with NICO's second, third, and fourth claims for declaratory relief, to New York.

**CONCLUSION**

The Court appreciates that this forum would be more convenient for NICO, and credits NICO's assertion that it has brought its claims in a good-faith effort to expeditiously resolve a complex dispute spanning multiple states. Nonetheless, this dispute will be more effectively resolved elsewhere.

THEREFORE, IT IS ORDERED:

1. The Court finds, on its own motion, that this case can be more efficiently resolved by proceeding separately in Illinois and New York.

2. On or before noon on April 1, 2014, NICO shall inform the Court whether it prefers for the Court to either:

    a. Dismiss NICO's claims without prejudice; or

---

[14] As a final point of procedure, the Court notes that ample authority supports its ability to raise and determine these issues *sua sponte*. In disposing of parallel litigation, the Court may order transfer on its own motion. *See*, *Hilton v. Apple Inc.*, 2013 WL 5487317, at *10 (N.D. Cal. Oct. 1, 2013); *Barbour Group v. Encon Int'l, Inc.*, 2013 WL 3781505, at *6 (D. Kan. July 18, 2013); *cf.*, *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1336 (11th Cir. 2011) (court may *sua sponte* order transfer under § 1404(a); *I–T–E Circuit Breaker Co. v. Becker,* 343 F.2d 361, 363 (8th Cir. 1965). And Rule 21 explicitly allows the Court to sever claims on its own motion. Fed. R. Civ. P. 21.

      b.     Sever NICO's claims and transfer them to Illinois and New York.

3.     If the Court receives no response, it will sever and transfer NICO's claims without further notice.

Dated this 31st day of March, 2014.

                        BY THE COURT:

                        *[signature]*

                        John M. Gerrard
                        United States District Judge